# CRIMINAL COMPLAINT AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR AN ARREST WARRANT

Your Affiant Edward F. Winkelspecht does swear and affirm the following to be true:

## I. INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for an arrest warrant for CHADWICK S. GHESQUIERE for violations of 18 U.S.C. § 1958, for Use of Interstate Commerce Facilities in the Commission of Murder for Hire. Your affiant attests that these violations occurred in or about July and August of 2016, in Virginia Beach, in the Eastern District of Virginia.

2. Your Affiant is a Special Agent for the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and has served in that capacity since January 4, 2009. I am currently assigned to the Norfolk Field Office and charged with investigating violations of federal firearms, explosives, and arson laws. I am a graduate of both the Criminal Investigator Training Program and the ATF National Academy. At the ATF National Academy, I received special training in alcohol, tobacco, firearms, arson, explosives, and narcotic related crimes. Prior to becoming a Special Agent with ATF, I was a Chesapeake Police Officer in the state of Virginia from 1998 until 2008. As a law enforcement officer, I've investigated numerous crimes involving firearms and narcotics. These investigations required me to apply for search and arrest warrants in federal and state court. In April of 2008 to December of 2008, I was assigned to the Drug Enforcement Agency (DEA) as a Task Force Officer and investigated numerous drug and firearm violations in that capacity as well.

3. Your Affiant has become aware of the facts and circumstances described below through my personal observation, my training and experience, information provided by other law enforcement officers, witness interview(s), and suspect statement(s). Since this Affidavit is being submitted for the limited purpose of securing an arrest warrant, I have not included each and every fact known concerning this investigation. Rather, I have set forth only those facts that are necessary to establish probable cause for a complaint and arrest warrant.

## II. PROBABLE CAUSE

4. On July 28, 2016, ATF and NCIS Special Agents met with a Confidential Source, hereinafter "CS", who wanted to provide information about Chadwick Stanley GHESQUIERE's criminal activity. The CS advised that she/he had known GHESQUIERE for approximately four (4) years. The CS informed agents that approximately 2-3 years prior (to 2016), GHESQUIERE and his wife, [redacted], hereinafter '[redacted]' or "wife" or "K M-G" or "wife K M-G" were having marital issues and eventually separated. The CS advised that as a result of the marital issues, GHESQUIERE and wife K M-G were going through a divorce and custody dispute over their juvenile child, hereinafter BG. The CS informed agents that at the beginning of the separation and custody dispute, GHESQUIERE made a comment to the CS about "getting rid of her." The CS advised that as time went on, GHESQUIERE made several additional comments to the CS about getting rid of his wife, specifically stating that he (GHESQUIERE) wanted to kill her, so he didn't have to deal with her or pay child support.

5. The CS recalled that in late June or early July of 2016, GHESQUIERE and wife K M-G got into a dispute because wife K M-G wouldn't let GHESQUIERE see BG. A few days after this incident, GHESQUIERE stated to the CS, "I want to get rid of this bitch because she is going to keep fucking with me, do you have someone that will off that bitch?" Your affiant is

2

aware that "off" when used in this context, is slang for "kill." The CS explained that, GHESQUIERE informed her/him that he (GHESQUIERE) had recently checked the life insurance policy on wife K M-G, and confirmed that he was still the beneficiary. GHESQUIERE then advised the CS that he would give up half of his insurance policy to get rid of her. GHESQUIERE then told the CS that if he/she couldn't find someone to do it, GHESQUIERE would find someone himself. Subsequent to the aforementioned GHESQUIERE statement(s), the CS advised GHESQUIERE that she/he had a friend that would carry out the murder however that individual was out of town. The CS then advised GHESQUIERE not to talk to anyone else about their conversation. The CS informed agents that he/she had advised GHESQUIERE not to talk to anyone else for fear that GHESQUIERE would actually find someone else to carry out the murder. Subsequent to the conversation with GHESQUIERE, the CS contacted ATF to report GHESQUIERE's intentions to have his wife K M-G killed.

6. On or about July 25, 2016, GHESQUIERE contacted the CS and asked when her/his friend would be back in town. The CS advised GHESQUIERE that her/his friend would be back in town soon. During this conversation, GHESQUIERE commented to the CS that the police would look at him first, but indicated that he would be able to handle the situation. Consequent to informing agents about this contact, the CS advised agents that she/he had previously observed GHESQUIERE with firearms, and that GHESQUIERE sold prescription pills (Adderall).

7. Agents subsequently conducted a check of GHESQUIERE's life insurance policy, and confirmed that GHESQUIERE had an active Family Saving Group Life Insurance (FSGLI) policy on his wife, in the amount of $100,000.00. FSGLI is a program that provides term life insurance coverage to the spouses and dependent children of Servicemembers insured under

3

SGLI. The Servicemember pays the premium, based on age, for spousal coverage. Dependent children are insured at no cost. By law, if a Servicemember is insured, the spouse is also insured unless coverage is declined. Premium deductions are based on the member's information in the Defense Enrollment Eligibility Reporting System (DEERS). The Offices of Service Members Life Insurance are located outside the state of Virginia and administered currently by Prudential. Upon the death of a spouse, the military Casualty Office is contacted by the Servicemember and the Form SGLV 8700 is submitted via facsimile. Further, a copy is sent to the Personnel Office to ensure premium deduction is stopped. All forms relating FSGLI coverage are submitted via mail or electronically and retained in the Servicemembers Official Military Personnel File (OMPF) by Navy Personnel Command (PERS-13) in Millington, Tennessee. Claims submittals made to the Navy Casualty Assistance Branch (PERS-13) are submitted by Personnel Casualty Reports (PCR) using the Defense Casualty Information Processing System (DCIPS) as specified in NAVADMIN 090/15 (21 APR 2015) and/or per MILPERMAN 1741-030, CH-54, 15 March 2016 using email to PERS-13 at: [redacted] The FSGLI claims submittal requires four specific official documents be submitted to PERS-13 Casualty Assistance Branch.

8. Agents also later confirmed that the payment for SGLI and FSGLI were being deducted directly from GHESQUIERE's active duty Navy paycheck processed by the Defense Finance and Accounting Service (DFAS), located outside the State of Virginia. The Leave and Earning Statement (LES) documents deductions for SGLI and FSGLI for a service member and the LESs are either mailed to the service member or accessed electronically via DFAS My Pay, a web based system, by the service member.

9. On or about August 2, 2016, the CS informed agents that GHESQUIERE came to her/his residence. The CS advised that she/he recorded the conversation. Your affiant

subsequently reviewed this recording and identified the following statements made by GHESQUIERE: GHESQUIERE stated that he had recently purchased a firearm, he had $1000.00 down payment for the individual that GHESQUIERE thought was being hired to kill his wife, and GHESQUIERE was selling prescription pills.

10. Your affiant conducted a firearms background check query through Virginia State Police, in order to verify if GHESQUIERE had recently gone through a background check in relation to a firearm(s) purchase. The results of this check confirmed that on July 30, 2016, GHESQUIERE filled out an application to purchase a firearm from a federally licensed firearms dealer located in Virginia Beach, Virginia. [Agent Note: This check does not confirm if the purchase of the firearm was completed, only that a background check was conducted in relation to a firearm(s) purchase.]

11. On August 4, 2016, agents directed the CS to meet with GHESQUIERE regarding the Murder for Hire plot to kill wife K M-G. Prior to the meet, agents directed the CS to call GHESQUIERE to ensure that he was at his residence, and to direct GHESQUIERE to get into the CS' vehicle upon arrival. Also, prior to the CS departing for GHESQUIERE's residence, audio and video recording devices were concealed within the CS vehicle to capture the meet and conversation. The CS subsequently departed for the GHESQUIERE residence, and upon arrival, GHESQUIERE exited his residence and entered the CS vehicle. Upon entering the CS vehicle, GHESQUIERE discussed the plot to kill his wife K M-G. In addition to several other details regarding the Murder for Hire plot, surveillance equipment captured the following:

- The CS informed GHESQUIERE that "CJ" would be returning back in town the following week. GHESQUIERE believed that "CJ", hereinafter the "Under Cover Agent" or "UC," was the hitman that would kill his wife.

5

- GHESQUIERE confirmed he wanted to proceed forward with the Murder for Hire.
- In reference to the insurance policy on his wife, GHESQUIERE advised the CS that he looked at the policy and confirmed that it was for $100,000.00, and that payments for the policy have been coming out of his paycheck.
- GHESQUIERE confirmed he would split the $100,000.00 insurance policy with the hitman.
- GHESQUIERE told the CS that he preferred the hitman to do it (kill his wife) when GHESQUIERE had their juvenile child BG, so he wouldn't have to pick BG up.
- GHESQUIERE confirmed he had $1000.00 down payment for the hit man.

The below picture of GHESQUIERE was taken from video surveillance equipment concealed inside the CS vehicle during the August 4, 2016, meet. This meet was recorded on both audio and video surveillance equipment.



12. On August 10, 2016, agent's utilized the CS to meet with GHESQUIERE, and introduce a UC agent posing as a hitman. Prior to the CS departing for GHESQUIERE's residence, audio and video recording devices were concealed within the CS vehicle to capture

the meet and conversation. When the CS and UC initially arrived at the GHESQUIERE residence, GHESQUIERE was not home. A second attempt to make contact with GHESQUIERE was successful, and upon arrival to the GHESQUIERE residence, GHESQUIERE entered the CS vehicle. Upon entering the CS vehicle, GHESQUIERE discussed the plot to kill his wife with the CS and UC. During the conversation between GHESQUIERE and the UC, GHESQUIERE confirmed to the UC that he wanted to have his wife killed. GHESQUIRE agreed to split half of the $100,000.00 life insurance policy with the UC, and provided the UC a down payment of $1000.00 in U.S. currency. GHESQUIERE also provided the UC a firearm that GHESQUIERE intended for the UC to use in order to carry out the Murder for Hire.

13. A subsequent Interstate Nexus examination of the firearm transferred to the UC by GHESQUIERE to further the Murder for Hire was conducted, and the firearm was found to be manufactured outside the state of Virginia, thus affecting interstate commerce.

14. Prior to the conclusion of the meet with the UC, GHESQUIERE agreed that the following week, he would provide additional information about his wife, which would assist the UC in committing the murder. In addition, GHESQUIERE agreed to purchase a "burner" (disposable) phone for the purpose of communicating with the UC. The UC provided GHESQUIERE a sheet of paper with the written phone number (███████) to an UC ATF phone, and informed GHESQUIERE to identify himself as "N" when he wanted to make contact, and the UC would identify himself as "C." GHESQUIERE also negotiated and agreed to provide 80 prescription pills (Adderall) to the UC as part of the down payment. The below picture of GHESQUIERE was taken from video surveillance equipment concealed inside the CS

vehicle during the August 10, 2016, meet with the UC. This meet was recorded on both audio and video surveillance equipment.



15.     In accordance with the Use of Interstate Commerce Facilities in the Commission of Federal Murder for Hire (18 U.S.C. § 1958), federal jurisdiction may be established by travel in interstate or foreign commerce, or by use of any facility of interstate or foreign commerce. The statute provides:

> (a) Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined under this title or imprisoned for not more than twenty years, or both; and if death results, shall be punished by death or life

8

imprisonment, or shall be fined not more than $250,000, or both.

(b) As used in this section and section 1959—

(1) "anything of pecuniary value" means anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage;

(2) "facility of interstate or foreign commerce" includes means of transportation and communication; and

(3) "State" includes a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States.

16. In order for the UC to travel to Virginia Beach and meet with GHESQUIERE, the UC utilized Interstate 95 more than once, as the most direct means, to travel back and forth from their ATF field office location.[1] Among other ways, federal jurisdiction was established by traveling in interstate or foreign commerce, and by using a facility of interstate or foreign commerce such as the UC phone purchased to communicate with GHESQUIERE.

17. The CS informed agents that on August 11, 2016, GHESQUIERE asked the CS to purchase a "burner" phone for him, so he could communicate with the UC before and after the murder of his wife. The CS also informed agents that GHESQUIERE asked the CS to come over and practice questioning him as law enforcement presumably would after the murder. The CS was able to record this communication with GHESQUIERE. Your affiant reviewed this recording, and confirmed the information provided by the CS. On August 13, 2016, the UC

---

[1] In accordance with Title 29 CFR 776.29 - Instrumentalities and Channels of interstate commerce, examples of instrumentalities include channels which serve as the media for the movement of goods and persons in interstate commerce, or for interstate communications, including highways, telephones, etc., which are regularly used in interstate commerce. In addition, 29 CFR 776.29 highlights that an instrumentality of interstate commerce need not stretch across State lines, but may operate within a particular State as a link in a chain or system of conduits through which interstate commerce moves; thus a facility may be used for both interstate and intrastate commerce, but when it is so used, it is nonetheless an interstate instrumentality.

received a text from an anonymous number, where the person communicating identified themselves as "N." The below picture was taken from the UC phone and depicts text communication between "N" and "C" (UC).



18.     Your affiant conducted a detailed phone report for the identified number in the above photo, and your affiant confirmed that ▮▮▮▮▮▮▮▮▮▮ is an active AT&T mobile cell phone number. Based on my experience and training, the phone is a facility in interstate commerce. To activate the pre-paid phone one must communicate in interstate commerce either via a toll free number phone facility or by web-based facilities, thus a ~~facility~~ affecting interstate commerce. Based on my training and experience, your affiant is aware that it is common for individuals engaged in criminal activity to use "burner" phones, in order to conceal the identity of the communicator, due to the fact that personal information verification is not required to

10

purchase and/or to activate "burner" phones. Your affiant is also aware that in order to activate an AT&T "burner" phone, it is common practice to activate the phone by calling the provided "800" activation number. On August 15, 2016, an ATF agent conferred with AT&T representative(s), and verified that there is no "burner" phone activation call centers located within the state of Virginia. During this same call, the AT&T representative confirmed that the aforementioned call centers are only located in OK, TX, NY, FL, and LA; thus a facility affecting interstate commerce in the commission of Murder for Hire.

19. On August 16, 2016, agents planned to follow up with GHESQUIERE to obtain a photograph of GHESQUIERE's wife and additional information that would assist the UC with killing her. Your affiant met with the CS and installed audio and video recording devices within the CS vehicle to capture the meet and conversation. The CS was directed to drive the UC to GHESQUIERE residence. Once the CS and UC arrived at GHESQUIERE residence, GHESQUIERE entered the CS vehicle. Upon entering the CS vehicle, GHESQUIERE discussed the plot to kill his wife with the CS and UC. During the conversation between GHESQUIERE and the UC, GHESQUIERE confirmed to the UC that he still wanted to have his wife killed. GHESQUIERE provided her home address, a description of known vehicles, two (2) photographs of his wife, and the rest of the down payment (80 Adderall pills) to the UC. Your affiant inspected one of the photographs which appeared to have been printed on computer paper and then cut with scissors.

20. The below picture of GHESQUIERE was taken from video surveillance equipment concealed inside the CS vehicle during the August 16, 2016, meet with the UC. This meet was recorded on both audio and video surveillance equipment.



## III. CONCLUSION

21. Based on the aforementioned facts, I submit that there is probable cause to believe that Chadwick Stanley GHESQUIERE, unlawfully engaged in the Use of Interstate Commerce Facilities in the Commission of Murder for Hire, in violation of 18 U.S.C. § 1958.

FURTHER YOUR AFFIANT SAYETH NOT.

Edward F. Winkelspecht, Special Agent
Bureau of Alcohol, Tobacco and Firearms

Read and Reviewed:

Kevin M. Comstock
Assistant United States Attorney

Sworn and subscribed to before me this 17th day of August, 2016.

UNITED STATES MAGISTRATE JUDGE